J. S63015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF:  J.R.F., A MINOR :    IN THE SUPERIOR COURT OF
                 :          PENNSYLVANIA
                 :
APPEAL OF:  J.F., FATHER     :      No. 3693 EDA 2015

Appeal from the Order Entered November 4, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. AP# CP-51-AP-0000205-2014,
DP# CP-51-DP-0002022-2011, FID# 51-FN-382382-2009

IN THE INTEREST OF:  Z.F., A MINOR :    IN THE SUPERIOR COURT OF
                 :          PENNSYLVANIA
                 :
APPEAL OF:  J.F., FATHER     :      No. 3696 EDA 2015

Appeal from the Order Entered November 4, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. AP# CP-51-AP-0000203-2014,
DP# CP-51-DP-0002024-2011, FID# 51-FN-382382-2009

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:    **FILED SEPTEMBER 28, 2016**

J.F. ("Father") appeals from the decrees and orders entered November 4, 2015, in the Court of Common Pleas of Philadelphia County, Family Court Division, granting the petitions of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating his parental rights to his dependent, female children, J.R.F., born in March of 2010, and Z.F.,

---

* Former Justice specially assigned to the Superior Court.

born in April of 2011 (collectively, the "Children"),[1] pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b), and changing the Children's permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351.[2] [3] After review, we affirm.

We summarize the relevant procedural and factual history as follows:

This family became known to DHS on April 16, 2011, when DHS received a General Protective Services report that Mother and her newborn children tested positive for benzodiazepines and marijuana at the time of delivery.[4] (Notes of testimony, 7/10/15 at 98-100, 126.) Mental health and domestic violence issues were also raised. (Notes of testimony, 8/5/14 at 39-40; 7/10/15 at 103-104, 135.) On November 9, 2011, the Children were

---

[1] Father additionally has a younger male child, not subject to this case, with whom DHS was involved and who was ultimately returned to Father's custody. (Notes of testimony, 7/10/15 at 63-65.) It is unclear from the record if Mother is the biological mother of this child.

[2] In separate decrees entered on the same date, the trial court terminated the parental rights of the Children's mother, S.S. ("Mother"), also pursuant to Sections 2511(a)(1), (2), (5), (8), and (b). Mother has filed an appeal at Pennsylvania Superior Court Docket Nos. 3520 EDA 2015 and 3522 EDA 2015.

[3] As Father does not raise the change of the Children's permanency goal to adoption in his concise statement of statement of questions section of his brief, we find the issue is waived. *Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that, a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

[4] Mother gave birth to twins, one of whom did not survive. (Notes of testimony, 7/10/15 at 126.)

adjudicated dependent with DHS supervision and in-home services.[5] (Notes of testimony, 7/10/15 at 100, 110, 117.)

After Mother was observed under the influence, on January 9, 2013, DHS obtained Orders of Protective Custody for the Children. (DHS Exhibit 2; notes of testimony, 7/10/15 at 105-106.) On January 11, 2013, the court then committed the Children to DHS custody and placed them in foster care.[6] (DHS Exhibit 2; notes of testimony, 7/10/15 at 105-108.) On March 20, 2013, the court again adjudicated the Children dependent. (DHS Exhibit 2.)

Father's FSP objectives included drug and alcohol treatment, domestic violence counseling, parenting classes, appropriate housing, and visitation with the Children. (Notes of testimony, 8/5/14 at 29, 50; 7/10/15 at 122, 125.)

In March of 2014, the case was transferred to Turning Points for Children, a Community Umbrella Agency ("CUA"). (Notes of testimony, 8/5/14 at 16; 7/10/15 at 12.) Prior to transfer, in March 2014, DHS changed the Children's permanency goal with regard to the FSP to adoption. (Notes of testimony, 8/5/14 at 25-29, 43-45.)

---

[5] Father and Mother appealed this determination at Pennsylvania Superior Court Docket Nos. 321 EDA 2013 and 322 EDA 2013, respectively. These appeals were ultimately dismissed on May 23, 2013 for failure to file a brief.

[6] The Children are currently placed together in kinship care in a pre-adoptive home. (Notes of testimony, 7/10/15 at 28, 34.)

The trial court held permanency review hearings in this matter on June 20, 2013, October 15, 2013, and January 14, 2014. Throughout these reviews, the trial court maintained the Children's commitment, placement, and permanency goal.

On April 30, 2014, DHS filed petitions to involuntarily terminate parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b), and to change the Children's permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351. The court then conducted combined termination and goal change hearings on August 5, 2014, July 10, 2015, and August 13, 2015. Mother and Father each testified on their own behalf. Additionally, the court heard from the following witnesses: Markey Mosley, former DHS social worker; Alimata Doumbia, case manager and supervisor, Turning Points for Children; Craig Minus, DHS social worker; Dr. Erica Williams, psychologist, Assessment & Treatment Alternatives, Inc.;[7] Devon Jacques, case manager, Turning Points for Children; Devonnae Grasty, visitation coach, Turning Points for Children; Cipriana Arias, permanency specialist, Turning Points for Children; and Christina Tavares, child advocate social worker.

---

[7] Dr. Williams conducted a parenting evaluation as to Mother and issued a related report dated July 3, 2014, and marked DHS Exhibit 27. (Notes of testimony, 7/10/15 at 130. **See** DHS Exhibit 27.) She therefore offered testimony as to Mother only. (Notes of testimony, 7/10/15 at 128-155.)

On November 4, 2015, following the submission of written closing argument, the trial court entered decrees involuntarily terminating Father's parental rights to the Children and orders changing the permanency goal to adoption. Thereafter, on December 3, 2015, Father, through appointed counsel, filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this court consolidated *sua sponte* on January 12, 2016.

On appeal, Father raises the following issues for review:

> 1. Whether the Trial Court erred by terminating the parental rights of Appellant, Father, under 23 Pa.C.S.A. § 2511 subsections (a)(1),(a)(2),(a)(5) and § 2511(a)(8)?
>
> 2. Whether the Trial Court erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of Appellant's parental rights best serves the child's developmental, physical and emotional needs and welfare?

Father's brief, at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice,

> bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179, 1190 (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the

needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b).[8] We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination pursuant to Sections 2511(a)(2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

    **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

        . . . .

---

[8] We note that Father argues that Sections 2511(a)(5) and (8) are not applicable as the Children were "removed from only Mother's home and were never in the care of the Father." (Father's brief, at 13-14.) As we review and uphold the court's termination under Section 2511(a)(2), we need not address this issue.

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

We first examine the court's termination of Father's parental rights under Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental

> well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

In finding evidence establishing grounds under Section 2511(a)(2), as well as (a)(5) and (a)(8), the trial court explained:

> This Court found clear and convincing evidence to terminate Father's parental rights pursuant to Sections 2511(a)(2),(5) and (8). The evidence supports this Court's finding that Father lacked the capacity to provide a stable and safe living environment for the Children. Father failed to obtain employment, suitable housing, was inconsistent with mental health treatment and continued to display anger problems. Furthermore Father continued to maintain a relationship with Mother, an active drug user, despite the existence of severe domestic violence problems. Although certificates were presented as evidence that Father had addressed his objectives, this Court found that the fact that Father was able to obtain certain certificates did not equate with his being in a position to parent the Children. Father blamed the system for his current circumstance and took no accountability for his behavior. In addition, the Court found it was in the Children's best interests to terminate Father's rights because the Children, were doing well in their

> pre-adoptive home, under the care of their foster parents who were meeting all of their needs.

Trial court opinion, 3/22/16 at 11-12 (citations to record omitted).

Father, however, argues that he completed his FSP objectives, which included drug and alcohol treatment, mental health treatment, domestic violence classes, and visitation with the Children. (Father's brief, at 11-12.) Father also notes testimony that his younger son was returned to his care and custody. (*Id.* at 12.) As a result, Father therefore avers that he "does not believe that DHS proved by clear and convincing evidence that a continued incapacity remains and that there are any barriers to reunification with his Children." (*Id.*)

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). Testimony was presented that Father's current living accommodations were not appropriate for reunification with the Children, nor were his prior accommodations. (Notes of testimony, 7/10/15 at 49-51, 171-174.) Significantly, Father was residing in a one-bedroom apartment with his brother, thereby leaving the Children without their own room. (*Id.* at 171-172.) Alimata Doumbia, Turning Points for Children case manager and supervisor, indicated, "Father was informed that the Children needed to have their own room, their own living space." (*Id.* at 51.)

Also of concern was the volatile nature of Mother and Father's relationship and the fact that they remained in a relationship. (*Id.* at 178,

197-198, 202, 206-207.) On this topic, Devon Jacques, Turning Points for Children case manager, testified to trepidation related to ongoing domestic violence. (***Id.*** at 206-207.)

> Q. Mr. Jacques, obviously, you have concerns about the relationship between [M]other and [F]ather? You've been on this case for four months, correct?
>
> A. Close to five months.
>
> Q. Close to five months. When you got the case [M]other and [F]ather were engaged to be married?
>
> A. Around that time, yes.
>
> Q. And then they broke up for some period of time?
>
> A. Yes.
>
> Q. And now they're back together?
>
> A. Yes.
>
> Q. Would you say they have a volatile relationship?
>
> A. I would.
>
> Q. Now, you said you did not observe any violence between [M]other and [F]ather, but you said it was verified. Can you explain what you mean?
>
> A. Meaning [F]ather and [M]other had an incident. Family was aware of it but the police were not called.
>
> Q. And based on the history you have concerns that the domestic violence is ongoing?

> A.    Yes.
>
> Q.    Why does that concern you for reunification purposes?
>
> A.    It conflicts with the stability of the [C]hildren.
>
> Q.    Stability that they have with [K.H.] and that family?
>
> A.    Yes.

*Id.* at 206-207.   Likewise, despite certification of completion of classes, Father continued to display signs of anger management issues, lashing out at various case workers involved with this matter, creating an apprehension as to whether Father could control his anger in the presence of the Children. (Notes of testimony, 8/5/14 at 34, 38; 7/10/15 at 26, 58-59, 68; 8/13/15 at 41-44.)

In addition, those who supervised Father's visits with the Children reported that Father had problems controlling the Children during visitation, resulting in his walking out of a visit on one occasion and holding a child down on the ground in another.  (Notes of testimony, 8/13/15 at 11-14, 19-20.)  Father additionally missed visitation with the Children, missing 10 of 32 visits.  (*Id.* at 177-178.)  Relatedly, Mr. Jacques testified that Father frequently scheduled appointments during the time he was supposed to have visitation.  (*Id.* at 181-182.)  Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or

subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

In examining Section 2511(b), the trial court stated:

> The Children who were four (4) years and five (5) years old were living in the same pre-adoptive foster home in kinship care with [K.H.], Mother's cousin, and her husband where all of their daily needs were being met. Ms. Doumbia testified that the child, J.R.F., was attending school regularly and had a great bond with the kinship parents. Ms. Doumbia testified that the child, Z.F., was receiving services thru [sic] Elwyn and had a parent-child relationship with the foster parents who provided her with a loving home where she was happy. Ms. Tavares testified that she observed the Children in the foster home and described them as happy and talkative, fighting to get her attention so that they could show her pictures of what they had done as a family. Additionally, Ms. Doumbia testified that, in her opinion, the Children would not suffer any irreparable harm if Father's parental rights were to be terminated. This was based upon Ms. Doumbia's opinion that there was no parent-child bond between the Children and Father together with the fact that all of the Children's daily needs were being provided by the kinship foster parents whom with [sic] the Children are happy. This opinion was corroborated by Mr. Jacques who agreed that the Children would not suffer any irreparable harm if Father's parental rights were to be terminated. Mr. Jacques strongly believed that the Children would suffer irreparable harm if they were to be removed from the care of their kinship foster parents. Mr. Jacques added that the Children are bonded with their kinship foster parents where they feel safe, comfortable and secure. Mr. Jacques noted that the Children have a loving relationship with the kinship foster parents who are meeting all of their emotional and individual needs. This Court also

> heard testimony from Devonnae Grasty, a visitation coach from Turning Points for Children. Ms. Grasty testified that the Children don't respect Father nor do they identify him as a Father figure. According to Ms. Grasty, there was no parent-child bond between the Children and Father. Finally, Mr. Mosley[9] testified that, in his opinion, it would be in the Children's best interest for their goal to be changed to adoption.

Trial court opinion, 3/22/16 at 12-13 (citations to record omitted).

Father argues that the Children are bonded to him and that termination of his parental rights would be detrimental to their well-being. (Father's brief, at 16.) Moreover, Father again indicates that DHS did not meet their burden. (*Id.*) Father points to testimony that his visits with the Children were "consistent" and "appropriate" and that the Children were "happy" when they saw Father. (*Id.* at 15, 16.) Likewise, Father notes testimony of those in support of unsupervised visitation. (*Id.* at 16.)

Here, the record likewise corroborates the trial court's termination order pursuant to Section 2511(b). Initially, we note that the Children are in pre-adoptive homes. (Notes of testimony, 7/10/15 at 28, 34.) While Father had visitation with the Children, this visitation remained supervised due to concerns related to Father's relationship with Mother. (*Id.* at 8, 197-198, 202, 206-207.)

---

[9] The court incorrectly refers to Ms. Mosley as Mr. Mosely. This error did not affect this court's analysis.

Further, as highlighted by the trial court, Alimata Doumbia, Turning Points for Children case manager and supervisor, testified to her opinion that the Children would not suffer irreparable harm if Father's parental rights were terminated, noting the lack of a parent-child bond between Father and the Children, and the relationship between the Children and their kinship provider. (Notes of testimony, 7/10/15 at 57, 61-62.) As Ms. Doumbia indicated:

> From the visits that I have observed with them, it's not a parent child relationship from my observation that I've seen with them. The Children are getting their daily needs met through the kinship provider. They look to the kinship provider as the support, as the safety. They're happy of where they're at right now. . . .

*Id.* at 57. She further testified:

Q. Do you believe that there is a parent child bond with [Father]?

A. In whom?

Q. In [Z.F.]?

A. [Z.F.], parent child, no.

Q. Why not?

A. Again, from my observation during the visit, it's more a playtime. [Z.F.] does not listen. At times, he would have difficulty redirecting her. And I guess, just from my observations between the two visits at the kinship home and father and [Z.F.], it was a big difference. So that's why I would say that.

Q.   And as far as [J.R.F.] and [Father] is there a parent child bond?

A.   Again, no, with the same testimony as with the differences from my observations with the kinship provider and the visits that I have observed.

Q.   And based on that you believe there would be no irreparable harm if rights were terminated?

A.   No.

*Id.* at 61-62.

Devonnae Grasty, Turning Points for Children visitation coach, who supervised visits between Father and the Children, echoed the opinion of the lack of a parent-child bond between Father and the Children, noting a lack of respect of Father on the part of the Children. (Notes of testimony, 7/10/15 at 217-218.) "It appears to me that they don't respect him, the way they talk back and the way that they, you know, try to hit him and things like that." (*Id.*) Ms. Grasty contrasted this to the way the Children interact with their kinship provider. (*Id.* at 218.)

Importantly, Devon Jacques, Turning Points for Children case manager, and Christina Tavares, child advocate social worker, further emphasized the positive, stable relationship between the Children and their kinship provider. (Notes of testimony, 7/10/15 at 184-187; 8/13/15 at 33-34.) As noted by the trial court, Mr. Jacques even indicated his belief that the Children would conversely suffer emotional harm if separated from their kinship provider due to the existence of a bond and the security they are

afforded. (Notes of testimony, 7/10/15 at 184-187.) Further, having met the Children in 2012, Ms. Tavares testified to the positive impact of this relationship on the Children. (Notes of testimony, 8/13/15 at 33-34.) Thus, as confirmed by the record, the emotional needs and welfare of the Children favor termination. Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Based on the foregoing analysis of the trial court's termination of Father's parental rights and change of the Children's permanency goal, we affirm the decrees and orders of the trial court.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/28/2016